IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
(Houston Division)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* DEIDRA GENTRY,<br><br>Relators,<br><br>v.<br><br>ENCOMPASS HEALTH REHABILITATION HOSPITAL OF PEARLAND, LLC<br><br>Defendant. | Civil Action No. 4:23-cv-1291 |

### RELATOR'S AMENDED COMPLAINT AND JURY DEMAND

Qui tam relator Deidra Gentry ("Relator"), by her undersigned attorneys, hereby alleges as follows:

1. This is a civil action brought on behalf of the Encompass Health Rehabilitation Hospital of Pearland, LLC ("Encompass") to recover damages and civil penalties under the False Claims Act, 3 I U.S.C. §§3729-3733, as amended by the False Claims Act Amendments of 1986, 42 U.S.C. §1320a-7b, 42 U.S.C. § 1395 (nn), the Fraud Enforcement and Recovery Act of 2009, and the Patient Protection and Affordable Care Act of 2010. Relator has complied with 31 U.S.C. § 3730-(b)(2) and sent to the United States Attorney a statement of all material evidence and information related to this Amended Complaint prior to filing the Amended Complaint. This Disclosure is supported by material evidence known to the Relator establishing the existence of the Defendant's false claims. Because the Disclosure Statement includes attorney-client communications and work product of Relator's attorney to the Attorney General and the US Attorney in their capacity as potential co-counsel in this litigation, Relator understands the

AMENDED COMPLAINT                 1

disclosure to be confidential. Further, Relator is an "original source" within the meaning of 31 U.S.C. § 3730(E)(4)(B) and states that to her knowledge the information contained herein concerning Defendant's False Claims Act violations have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, nor in the news media.[1]

## VENUE AND JURISDICTION

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 139l (b) and (c) and 31 U.S.C. § 3732(a) and § 3730 (b), as well as 28 U.S.C. § 1345 and § 1331 and §1367 (a).

3. Venue is proper in this district pursuant to 28 U.S.C. § 139l(b) and (c) and 31 U.S.C. § 3732(a). Defendant was doing business in this district during the relevant time period, and the claims set forth in this Complaint arose, at least in part, in this district.

4. The United States of America is a real party in interest to the claims set forth herein.

5. Qui tam relator Deidra Gentry is a United States citizen and a resident of the State of Texas who worked for Defendant beginning on October 5, 2022 and witnessed numerous instances of fraudulent practices adopted by Defendant that violated the False Claims Act.

6. Defendant Encompass Health Rehabilitation Hospital of Pearland, LLC provides inpatient rehabilitation ("IRF") services in the Houston area and is the subject of the relator's claims in this suit.

---

[1] Relator previously filed a corrected complaint to address a scrivernor's error that contained no substantive change; thus relator contends that she is still entitled to an amendment as a matter of right. Furthermore, relator agreed in writing to a significant extension for Defendant to file the motion to dismiss in exchange for consent to file this amended complaint. *See* Rule 15(a)(2). If the Court disagrees, relator will file a motion for leave to file the instant complaint.

**LAW**

7. The False Claims Act (FCA) provides in pertinent part that:

Any person who (A) knowingly presents, or causes to be presented a false or fraudulent claim or payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of [the Act]; ... or (g) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government

***

is liable to the United States Government for a civil penalty of not less than $12,537 and not more than $25,076 plus 3 times the amount of damages which the Government sustains because of the act of that person. For purposes of this section, the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud. 31 U.S.C. § 3729. 42 U.S.C. § 1320 (a)-7(b) ("the Federal Anti-Kickback Act), prohibits a person or firm from providing or soliciting remuneration as an inducement for referrals of Medicare, Medicaid, or other healthcare program patients. 42 U.S.C. § 1395 (nn) prohibits self-referrals, and more specifically prohibits a physician from making certain referrals to entities with which the physician has a financial relationship. Claims submitted to federal healthcare programs based on referrals obtained in violation of the Anti-Kickback Act are false claims under the False Claims Act and all amounts paid by these programs as reimbursement for such claims constitute damages under the False Claims Act.

**PLANS**

<u>Medicare</u>

8.  Medicare is a government financial health insurance program administered by the Social Security Administration of the United States. Medicare was promulgated to provide payment for medical services, durable medical equipment, and other related health-related items for individuals 65 and over. Medicare also makes payments for certain health services provided to additional classes of individual health care patients under federal regulations. The United States, through the Department of Health and Human Services ("HHS") and its component agency, the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare Part A and Medicare Part B programs. Generally, hospitals are reimbursed through the Medicare Part A program, and physicians are reimbursed through the Medicare Part B program.

9.  Hospitals, skilled nursing facilities, home health agencies, hospices, and physicians who participate in the Medicare program, as well as other federal health care programs, are required to enter into contracts or "provider agreements" with HHS. Under the terms of these provider agreements, hospitals, physicians, hospice providers, skilled nursing facilities, and other participating healthcare providers certify that they will comply with all laws, regulations, and guidance concerning proper practices for Medicare providers. Compliance with these provider agreements is a condition for participation in and receipt of payments from the Medicare program. Therefore, providers such as Encompass must comply with the requirements of the Medicare and Medicaid programs to be eligible to receive payments from these programs for rehabilitative services.

10. Section 4421 of the Balanced Budget Act of 1997 modified how payment is made for IRF services by creating Section 1886(j) of the Social Security Act, which authorized

implementing a per-discharge prospective payment system of IRFs such as those operated by Encompass. The IRF PPS payment for each patient is based on information found in the IRF Patient Assessment Instrument (PAI), which contains patients' clinical, demographic, and other information and classifies the patients into distinct groups based on clinical characteristics and expected resource needs. As of July 1, 2006, the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Public Law 110-173) stipulated that the compliance threshold should be set no higher than 60 percent, which is now referred to as the "60 percent rule." The SS Act also stipulated that comorbidities that meet certain criteria as specified in 42 C.F.R. 412.23(b)(2)(i) must continue to be used to determine the compliance threshold.

11. Since May 7, 2004, 13 medical conditions qualify for the 60 percent rule and include stroke, burns, spinal cord injury, major multiple trauma, congenital deformity, amputation, fracture of the femur (hip fracture), brain injury, systemic vasculitis, with joint involvement, advanced osteoarthritis, knee or hip replacement, and neurological disorders (including multiple sclerosis), motor neuron disease, polyneuropathy, muscular dystrophy, and Parkinson's disease. Compliance percentage: This is the percentage of an IRF's total inpatient population that meets at least one of the medical conditions listed as 42 C.F.R. 4l 2.23(b)(2)(ii). Reasonable and necessary criteria for determining the reasonableness of IRF claims: Under Section I 862(a)(1) of the SS Act, effective for discharges that occur on or after January 1, 2010, claims for reasonable and necessary services are assessed under criteria that includes the key decision points considered and documented when making a decision to admit, retain or discharge a IRF patient; certain preadmission assessment requirements; a post-admission physician evaluation to verify that the beneficiary's preadmission assessment information remains unchanged or to document any changes; and specific requirements for an individualized overall plan of care for each individual.

12. Among the criteria for determining the reimbursement for admission into the IRF and for the provision of reasonable and necessary therapy and rehabilitative services under the SS Act, the IRF must determine that a beneficiary is sufficiently medically stable to benefit from IRF services; needs the coordinated care of multiple therapy disciplines uniquely provided in IRFs; needs the coordinated care of multiple therapy disciplines uniquely provided in IRFs; benefits from the intensity of rehabilitation therapy services uniquely provided in IRFs; requires close medical supervision for the management of medical conditions to support participation in an intensive rehabilitation therapy program; and possesses the cognitive ability to understand commands and retain information.

13. For an IRF claim to be paid by the government for Medicare and Medicaid claims, there must be a "reasonable expectation" at the time of admission that the patient meets IRF "coverage criteria." 42 CFR & 412.622 (a)(3). The "coverage criteria" generally require that the patient (1) can "reasonably be expected to actively participate in, and benefit from, an intensive rehabilitation therapy program," and (2) requires "physician supervision by a rehabilitation physician." The government also requires documentation of a preadmission screening and concurrence of the rehabilitation physician with that screening. 42 CFR § 412.622(a)(4). The licensed or certified clinician/clinicians conducting the preadmission screening/narrative must write out the detailed reasoning/justification for the IRF admission on the preadmission screening documentation. The rehabilitation physician is required to review and concur with this reasoning/justification. The government has clarified that IRF admission requires a level of physician judgment that cannot be delegated to a physician extender.

14. In sum, patients should only be admitted when they meet the criteria specified in the previous paragraphs. IRF care is only considered by Medicare to be reasonable and necessary under 1862(a)(1)(A) of the Social Security Act if the patient meets all of the

requirements outlined in 42 CFR §§412.622(a)(3), (4), and (5) and 74 Fed.Reg.39762, 39788 (Aug.7, 2009). No Medicare payment may be made for items or services that are not reasonable and necessary for diagnosing or treating illness or injury or for improving the functioning of a malformed body member (the Act § 1862(a)(1)(A)). When patients are improperly admitted because they do not meet the criteria and the criteria are falsified in order to qualify for payment of a claim, any such falsification for admission is a precursor to a false claim, and all requests for payment for such patients are false claims under the FCA.

## FRAUDULENT SCHEME

15. Defendant Encompass Health Rehabilitation Hospital of Pearland, LLC, is owned by Encompass Health Corporation, the leading provider of inpatient rehabilitation services and has decades of experience in the field.

16. On or about October 2022, Relator was hired by Encompass Health Rehabilitation Hospital of Pearland, LLC ("Encompass") to solicit rehab referrals for admission to various hospitals including but not limited to the Encompass Health Rehabilitation Hospital of Pearland, LLC, Encompass Health Rehabilitation Hospital of Sugar Land, LLC, Encompass Health Rehabilitation Hospital of Cypress, LLC, Encompass Health Rehabilitation of Humble, LLC, and Encompass Health Rehabilitation Hospital of Katy, LLC.

17. During her training at Encompass Health Rehabilitation Hospital of Pearland, LLC, in October 2022, Relator observed a peculiar process that differed significantly from her prior experiences in healthcare sales at various companies spanning almost twenty years.

18. Unlike conventional practices, sales representatives were prevented from accessing and receiving written materials describing the role of sales representatives in the admission process. In addition, sales representatives like Relator, who lacked a clinical background, received training on how to operate as clinical screeners. In fact, Encompass provided the sales

representatives with directives on how to tailor clinical language and make clinical judgments in order to generate patient admissions.

19. During Relator's first week of training, Novia Mearidy, the Business Development Director at the Pearland hospital location, instructed Relator how to target patients and how to go through the patient's progress notes from their hospital stay or home care and input medical justifications that ensured acceptance into this particular Encompass hospital. Relator was provided written medical scripts by Mearidy in order to guarantee acceptance as well. Relator was also told by her, *inter alia*, to input that the patient required three disciplines offered by Defendant and to input in her clinical narrative that the patient "required treatment" for an ailment if they complained about an ailment that could be related to a qualifying condition although she was in no position to make this clinical determination. Mearidy also asked Relator to relate as many complaints as possible to conditions such as a stroke, as it would generate a basis for admission to the hospitals as well as higher reimbursements.

20. Although Relator was aware that Medicare allowed nonclinical personnel to collect data, she was concerned about Medicare's prohibition against nonclinical personnel performing clinical screens, which entailed analyzing medical charts and exercising clinical judgment to generate a clinical narrative that determined a course of treatment/admission stay.

21. Encompass attempted to circumvent this problem by having the sales representatives provide these misleading narratives and then have the rehabilitation physicians certify/adopt the same. Indeed, once the sales representatives, who were incentivized by quota, performed prescreens/clinical narratives, Mearidy would instruct the sales representatives to send out requests through an electronic module to get Encompass's rehab physicians to rubber stamp these misleading entries on the same day and often near the same time. Mearidy emphasized to

relator that the clinical narratives generated by the sales representatives were relied upon by the physicians for admission purposes and the purpose of this process was to minimize the number of beds that remained empty after the current patients were discharged almost daily.

22. Also, Mearidy's written directives were to "ask for same day MCR (Medicare) referrals from home" although this type of segregation is also prohibited by Medicare. Again, to avoid detection, the Pearland hospital refused to allow the sales representatives to possess these directives outside of the facility.

23. Defendant's aforementioned admission process clearly defeated the purpose of having those with clinical backgrounds perform the prescreen as required by Medicare. Here, Encompass' physicians would have to rely on the compromised input of the sales representatives who were motivated by heavy sales quota/pressures to provide the medical clinical justification to cause admissions and just as importantly, they were unqualified to do so. In addition, Encompass' rehab physicians often had no practical ability to even evaluate the flawed justifications provided by the sales representatives because the modules would illustrate that the certifying physicians would be bombarded by several requests from sales representatives in very short times to certify the admissions such that relator witnessed certifications being electronically entered within one minute of the requests. Therefore, it was often practically impossible to review the clinical justifications of the patients for admissions purposes in that time frame even if the narratives contradicted Medicare's requirements for admissions and even if the narratives had been generated by individuals with a clinical background.

24. Apparently, the CEO of the Pearland hospital, Michael Cabiro recognized that the aforementioned scheme could be uncovered by Medicare auditors/regulators. To circumvent this, he plainly reminded the sales representatives, including the relator, and the certifying physicians,

that the times upon which the physician's adopted the clinical narratives be spread out in order to fly under the radar of Medicare regulators.

25.  Relator learned that she and each of Encompass's sales representatives were trained to take this approach in order to cause admissions to the other hospitals listed in this complaint and that Medicare was routinely billed based on the implementation of this process at these hospitals. Eventually, Relator received complaints from onsite clinicians at the Pearland Hospital on or about November 2022, that that the hospitals were repeatedly admitting patients who lacked medical justification due to the sales representatives' clinical narratives and the physician's certifications of the same.

26.  As time passed, relator even received feedback from the Pearland compliance auditor on or about December 2022, that patients were repeatedly admitted without medical justification. Rather than inform the sales representatives to discontinue making clinical narratives that were simultaneously adopted by the rehab physicians, the auditor instructed her and others on how the sales representatives should better extract certain magic language that would justify the bogus admissions.

27.  Undeterred by relator's and others expressed concerns, Mearidy demanded that her sales representatives, including relator, continue to meet sales quota and skirt Medicare guidelines for reimbursement by also omitting any language in their clinical narrative that made admissions to their hospitals inappropriate. In fact, on or about November 2022, at the behest of Mearidy, a patient named M. Harris with a date of birth of 1/8/1941, was admitted for skilled nursing services for 12 days. However, M. Harris (Patient #58062) was a "psych" patient who had expressed she was unable to participate in daily therapy prior to admission. Still, Medicare was billed approximately $20,000 based on (relator's) prescreen/clinical narrative and the certification by Dr.

Natasha Rose (Medical Director). The medical notes charts for this patient prior to admission clearly demonstrated that the patient refused therapy although the Medicare guidelines for this patient required that she be able to complete a minimum of fifteen hours of therapy per week. After admitting this patient with no medical necessity and no ability to benefit from treatment into the Pearland facility, Encompass refused to discharge prior to billing Medicare in the aforementioned amount her even after the medical chart indicated that this patient would not leave her room nor participate in any treatment modality immediately following the admission.

28. In addition, on or about, February 23, 2023, patient J.V. was admitted into the Pearland facility based on the submission /clinical narrative of relator. Ultimately, the patient caused the Government/Medicare to pay roughly $1,000 per day for this patient.

29. In addition, on or about November 2, 2022, Medicare was billed for 62 y/o patient 125956 based on the narrative of sales representative counterpart S.L. who claimed this patient required intensive therapy at the Encompass Health Sugarland Hospital, LLC

30. Relator discussed these observations with counterparts who had similar concerns that Defendant was causing fraudulent admissions/government reimbursements and one counterpart jokingly remarked about the potential for jail time in carrying out the directives of Encompass.

31. After Relator complained to management about the aforementioned violations on or about February 2023, she was ignored. Then, on or about March 2023, Relator complained to in-house counsel Dawn Rock that the Encompass process described above caused the submission of false claims. Relator also offered to provide the same level of specificity regarding the aforementioned violations to Mrs. Rock that she had already provided to management. Mrs. Rock redirected her complaints to management and within days, relator was terminated despite the fact

she had received glowing remarks from management just prior to her complaints..

## COUNT I

Claim By and on Behalf of the United States under the False Claims Act (Presenting False Claims).

1. Relator re-alleges and incorporate by reference paragraphs 1 through 14 as though fully set forth herein.

2. This is a claim under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

3. Relator has standing to maintain this action by virtue of 31 U.S.C. §§ 3730(b).

4. The False Claims Act, 31 U.S.C. § 3729(a)(l) and (2), imposes liability upon, inter alia, those who knowingly cause to be presented to an officer or employee of the United States, to include state Medicaid systems as federal grantees under 31 U.S.C.§ 3729I, false claims for payment or approval. It also imposes liability on those who conspire to get false claims paid. 31 U.S.C. § 3729(a)(3).

5. By virtue of the acts described herein, Defendant knowingly presented or caused false or fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented, to officials of the United States Government in violation of 31 U.S.C. § 3729(a)( l)(A), as amended.

6. Because the United States would not have paid for the aforementioned products, which it knew were the result of illegal inducements, the United States has been harmed in an amount equal to the value paid by the United States, directly or indirectly through State Medicaid programs.

7. By virtue of the false claims presented or caused to be presented by Defendant, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damaged, attorneys' fees and costs, plus civil money penalties of not less than

$12, 537 and not more than $25, 076 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT II

Claim By and on Behalf of the United States under the False Claims Act (False Records or Statements).

8. Relator re-alleges and incorporate by reference paragraphs 1 through 27 as though fully set forth herein.

9. This is a claim on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

10. Relator has standing to maintain this action by virtue of 31 U.S.C. § 3730(b).

11. By virtue of the acts described above and Defendant's use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the Government, Defendant caused to be made or used false records or statements to get false or fraudulent claims paid or approved by an agency of the United States Government, in violation of 31 U.S.C. § 3729(a)(l)(B).

12. By virtue of the false claims presented or caused to be presented by Defendant, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damaged, attorney's fees and costs, plus civil money penalties of not less than $12, 537 and not more than $25, 076 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT III

Claim By and on Behalf of the United States under the False Claims Act (Conspiracy to

Submit False Claims).

13. This is a claim on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

14. Relator re-alleges and incorporates by reference paragraphs 1 through 33 as though fully set forth herein.

15. By reason of the foregoing with respect to Defendant's fraudulent scheme, Defendant conspired together, and with others, to defraud the government in order to get false or fraudulent claims paid by Medicaid, in violation of 31 U.S.C. 31 U.S.C. § 3729 (a)(l)(C), as amended. In furtherance of the conspiracy, Defendant acted to affect the objects of the conspiracy alleged herein.

16. By virtue of the false claims presented or caused to be presented by

Defendant pursuant to this conspiracy, and by virtue of the false statements made in furtherance of this conspiracy, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil-money penalties of not less than $12, 537 and not more than $25, 076 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Relator demands a Jury as to all issues and counts so triable as a matter of right.

Respectfully submitted this the 25th day of March, 2024

*/s/Volney Brand*
**Volney Brand Law PLLC**
3626 N Hall, Ste 610
Dallas, TX 75219

Telephone: 214-932-1472
Fax: 214-932-1473

-AND-

Keith B. French
**KEITH B. FRENCH LAW, PLLC**
2734 Sunrise Blvd., Suite 304
Pearland, TX 77584
kfrench@peoplefirstfirm.com
Tel: 832-243-6153
Fax: 832-243-1927

**AMENDED COMPLAINT** 15

## **CERTIFICATE OF SERVICE**

Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW Washington, DC 20530-0001

U.S. Attorney's Office Houston, Tx

E-service to counsel of record.