## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### (Houston Division)

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel.* | ) | |
| DEIDRAGENTRY, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 4:23-cv-1291 |
| | ) | |
| v. | ) | |
| | ) | |
| ENCOMPASS | ) | |
| HEALTH REHABILITATION | ) | |
| HOSPITAL OF PEARLAND, LLC | ) | |
| | | |
| Defendant. | | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

COMES NOW, the above-named Relator, by and through undersigned counsel, and files this her Memorandum of Law in Opposition to Defendant Encompass Health Rehabilitation Hospital of Pearland, LLC ("Encompass")'s Motion to Dismiss, and in support thereof, states the following:

### I.    PROCEDURAL BACKGROUND

This case is a qui tam action brought on behalf of the United States of America pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA"), to recover damages and civil penalties based on false claims for payment that Defendant presented to the United States. Relator filed her original Complaint on September 25, 2023. (Doc No. 6). The United States filed a notice of non-intervention on September 26, 2023 (Doc. No. 7) and the next day the Court issued an Order unsealing the Complaint (Doc. No. 8). Relator filed an Amended

Complaint on March 20, 2024 (Doc. No. 22). Defendants filed a Motion to Dismiss the Amended Complaint on April 25, 2024 (Doc No. 33).

## II.    STATEMENT OF FACTS

The Amended Complaint ("AC") provides specific information about the fraudulent conduct giving rise to Relator's FCA claims and it sufficiently delineates the essential factual background of the fraud. On April 6, 2023, Relator filed her Complaint under seal. On March 25, Relator filed an Amended Complaint[1] and alleged the following:

> Defendant Encompass Health Rehabilitation Hospital of Pearland, LLC, is owned by Encompass Health Corporation, the leading provider of inpatient rehabilitation services and has decades of experience in the field.  On or about October 2022, Relator was hired by Encompass Health Rehabilitation Hospital of Pearland, LLC ("Encompass") to solicit rehab referrals for admission to various hospitals including but not limited to the Encompass Health Rehabilitation Hospital of Pearland, LLC, Encompass Health Rehabilitation Hospital of Sugar Land, LLC, Encompass Health Rehabilitation Hospital of Cypress, LLC, Encompass Health Rehabilitation of Humble, LLC, and Encompass Health Rehabilitation Hospital of Katy, LLC.   During her training at Encompass Health Rehabilitation Hospital of Pearland, LLC, in October 2022, Relator observed a peculiar process that differed significantly from her prior experiences in healthcare sales at various companies spanning almost twenty years.   Unlike conventional practices, sales representatives were prevented from accessing and receiving written materials describing the role of sales representatives in the admission process. In addition, sales representatives like Relator, who lacked a clinical background, received training on how to operate as clinical screeners.  In fact, Encompass provided the sales representatives with directives on how to tailor clinical language and make clinical judgments in order to generate patient admissions.   During Relator's first week of training, Novia Mearidy, the Business Development Director at the Pearland hospital location, instructed Relator how to target patients and how to go through the patient's progress notes from their hospital stay or home care and input medical justifications that ensured acceptance into this particular Encompass hospital. Relator was provided written medical scripts by Mearidy in order to guarantee acceptance as well. Relator was also told by her, *inter alia*, to input that the patient required three disciplines offered by Defendant and to input in her clinical narrative that the patient "required treatment" for an ailment if they complained about an ailment that could be

---

[1]Defendant refers to the amended complaint as a second amended complaint, however, as Relator previously pointed out, this is the First Amended Complaint. The Court previously determined Relator's scrivener's correction to remove a word naming a sealed defendant a "Corrected Original Complaint''—not an Amended Complaint. (Doc. 8).  *See Fund Liquidation Holdings LLC v. Bank of Am.Corp*., 991 F.3d 370 n.3 (2d Cir. 2021). Defendant has also acknowledged that Plaintiff only submitted an amended complaint.

related to a qualifying condition although she was in no position to make this clinical determination. Mearidy also asked Relator to relate as many complaints as possible to conditions such as a stroke, as it would generate a basis for admission to the hospitals as well as higher reimbursements.   Although Relator was aware that Medicare allowed nonclinical personnel to collect data, she was concerned about Medicare's prohibition against nonclinical personnel performing clinical screens, which entailed analyzing medical charts and exercising clinical judgment to generate a clinical narrative that determined a course of treatment/admission stay.  Encompass attempted to circumvent this problem by having the sales representatives provide these misleading narratives and then have the rehabilitation physicians certify/adopt the same. Indeed, once the sales representatives, who were incentivized by quota, performed prescreens/clinical narratives, Mearidy would instruct the sales representatives to send out requests through an electronic module to get Encompass's rehab physicians to rubber stamp these misleading entries on the same day and often near the same time. Mearidy emphasized to Relator that the clinical narratives generated by the sales representatives were relied upon by the physicians for admission purposes and the purpose of this process was to minimize the number of beds that remained empty after the current patients were discharged almost daily.   Also, Mearidy's written directives were to "ask for same day MCR (Medicare) referrals from home" although this type of segregation is also prohibited by Medicare. Again, to avoid detection, the Pearland hospital refused to allow the sales representatives to possess these directives outside of the facility.   Defendant's aforementioned admission process clearly defeated the purpose of having those with clinical backgrounds perform the prescreen as required by Medicare. Here, Encompass' physicians would have to rely on the compromised input of the sales representatives who were motivated by heavy sales quota/pressures to provide the medical clinical justification to cause admissions and just as importantly, they were unqualified to do so. In addition, Encompass' rehab physicians often had no practical ability to even evaluate the flawed justifications provided by the sales representatives because the modules would illustrate that the certifying physicians would be bombarded by several requests from sales representatives in very short times to certify the admissions such that Relator witnessed certifications being electronically entered within one minute of the requests. Therefore, it was often practically impossible to review the clinical justifications of the patients for admissions purposes in that time frame even if the narratives contradicted Medicare's requirements for admissions and even if the narratives had been generated by individuals with a clinical background.  Apparently, the CEO of the Pearland hospital, Michael Cabiro recognized that the aforementioned scheme could be uncovered by Medicare auditors/regulators. To circumvent this, he plainly reminded the sales representatives, including the Relator, and the certifying physicians, that the times upon which the physician's adopted the clinical narratives be spread out in order to fly under the radar of Medicare regulators.  Relator learned that she and each of Encompass's sales representatives were trained to take this approach in order to cause admissions to the other hospitals listed in this complaint and that Medicare was routinely billed based on the implementation of this process at these hospitals. Eventually, Relator received complaints from onsite clinicians at the Pearland Hospital on or about November 2022, that that the hospitals were repeatedly admitting patients who lacked medical

3

justification due to the sales representatives' clinical narratives and the physician's certifications of the same.  As time passed, Relator even received feedback from the Pearland compliance auditor on or about December 2022, that patients were repeatedly admitted without medical justification. Rather than inform the sales representatives to discontinue making clinical narratives that were simultaneously adopted by the rehab physicians, the auditor instructed her and others on how the sales representatives should better extract certain magic language that would justify the bogus admissions.  Undeterred by Relator's and others expressed concerns, Mearidy demanded that her sales representatives, including Relator, continue to meet sales quota and skirt Medicare guidelines for reimbursement by also omitting any language in their clinical narrative that made admissions to their hospitals inappropriate. In fact, on or about November 2022, at the behest of Mearidy, a patient named M. Harris with a date of birth of 1/8/1941, was admitted for skilled nursing services for 12 days. However, M. Harris (Patient #58062) was a "psych" patient who had expressed she was unable to participate in daily therapy prior to admission. Still, Medicare was billed approximately $20,000 based on (Relator's) prescreen/clinical narrative and the certification by Dr. Natasha Rose (Medical Director). The medical notes charts for this patient prior to admission clearly demonstrated that the patient refused therapy although the Medicare guidelines for this patient required that she be able to complete a minimum of fifteen hours of therapy per week. After admitting this patient with no medical necessity and no ability to benefit from treatment into the Pearland facility, Encompass refused to discharge prior to billing Medicare in the aforementioned amount her even after the medical chart indicated that this patient would not leave her room nor participate in any treatment modality immediately following the admission.  In addition, on or about, February 23, 2023, patient J.V. was admitted into the Pearland facility based on the submission /clinical narrative of Relator. Ultimately, the patient caused the Government/Medicare to pay roughly $1,000 per day for this patient.  In addition, on or about November 2, 2022, Medicare was billed for 62 y/o patient 125956 based on the narrative of sales representative counterpart S.L. who claimed this patient required intensive therapy at the Encompass Health Sugarland Hospital, LLC. Relator discussed these observations with counterparts who had similar concerns that Defendant was causing fraudulent admissions/government reimbursements and one counterpart jokingly remarked about the potential for jail time in carrying out the directives of Encompass. After Relator complained to management about the aforementioned violations on or about February 2023, she was ignored. Then, on or about March 2023, Relator complained to in-house counsel Dawn Rock that the Encompass process described above caused the submission of false claims. Relator also offered to provide the same level of specificity regarding the aforementioned violations to Mrs. Rock that she had already provided to management. Mrs. Rock redirected her complaints to management and within days, Relator was terminated despite the fact she had received glowing remarks from management just prior to her complaints.

4

On April 25, 2024, Encompass filed its Renewed Motion to Dismiss (Doc. 33). Based on the arguments presented, factual circumstances, and relevant case law, Relator has sufficiently pled her claims, and Encompass' motion should be DENIED in its entirety.

### III.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)6 allows for a claim to be dismissed if it fails to "state a claim upon which relief can be granted." In order to survive a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. 544). "When there are well-pleaded factual allegations, a court should assume their veracity and *then* determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950 (emphasis supplied). As Judge Hamilton cautioned, "we must take care not to expand *Iqbal* too aggressively beyond its highly unusual context—allegations aimed at the nation's highest ranking law enforcement officials based on their response to unprecedented terrorist attacks on the United States homeland—to cut off potentially viable claims." *McCauley v. City of Chicago*, 671 F.3d 611, 628-29 (7th Cir. 2011) (Hamilton, J., dissenting).  Likewise, "As the Third Circuit has repeatedly stated, courts must be sensitive to the fact that applying Rule 9(b) before discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.'" *Kyko Global, Inc. v. Prithvi Information Solutions Ltd.*, No. 2:18-cv-01290-WSS, 2020 U.S. Dist. LEXIS 41532, at *70 (W.D. Pa. Mar. 10, 2020), quoting *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989), quoting *Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 99-100 (3d Cir. 1983).

But above all, a motion to dismiss under 12(b)(6) "should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and

would entitle it to relief." *Mylan Labs., Inc. v. Matkari*, F.3d 1130, 1134 (4th Cir. 1993); see also *Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012) (internal citations omitted) ("a complaint may not be dismissed unless it is impossible to prevail under *any* set of facts that *could* be proved consistent with the allegations.").

In order to state a claim under the False Claims Act ("FCA"), a Relator must allege a false statement or fraudulent course of conduct carried out with the requisite scienter that was material and that caused the government to pay out money or to forfeit money due. *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009). To satisfy the Rule 9(b) pleading requirement for this type of claim, Relator must "specify the statements contended to be fraudulent, identify the speaker, state when, and where the statements were made, and explain why the statements were fraudulent." *Flaherty v. Crumrine Preferred Income Fund, Inc. v. TXU* Corp., 565 F.3d 200, 207 (5th Cir. 2009). The Fifth Circuit has also stated that the 'time, place, contents, and identity standard is not a straitjacket for Rule 9(b)." *United States ex rel. Grubbs v. Kannegatti*, 565 F.3d 180, 185 (5th Cir. 2009). Indeed, a less rigid but nuanced approach is applied in this circuit. Under the Fifth Circuit's standard, "it is sufficient for a plaintiff to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Id*. at 190.

In other words, the application of Rule 9(b) is context-specific, and no single construction of this Rule applies in all contexts. *Id*. at 188. As importantly, "malice, intent, knowledge, and other condition of mind of a person may be generally averred." Fed. R. Civ. P. 9(b).

## IV.   ARGUMENT

The Court should reject Encompass' solicitation to abandon its own judicial common sense, ignore the pleadings as true, and reject any inferences in favor of the Plaintiff as required under the auspices of fidelity to Rule 9B or the holdings of *Iqbal* and *Twombly*. Encompass failed to prove that Relator's claims were insufficiently pleaded.

Ironically, the Defendant's argument is self-contradictory and lacks the coherence and specificity that is required to rebut the Relator's allegations. Without providing any legally supported argument or clear reasoning, Defendant's challenge fails to address the core issues raised by the complaint, which undermines its credibility and persuasiveness. Encompass started its brief by establishing the standard for an FCA claim.  After announcing the legal generalities associated with the FCA, however, Encompass failed to address *all of the relevant allegations* and *specific claims* in Relator's complaint. Further, Encompass failed to explain why it is entitled to dismissal under the governing legal standard.

For example, Encompass failed to address any of the statutory requirements associated with the FCA "presentment", "false records", or conspiracy claims, much less the most pertinent facts contained in the Amended Complaint concerning these claims. It also purposefully neglected to go beyond general complaints concerning the materiality of specific regulations.  The approach is clear—Encompass intends to develop these arguments for the first time in reply.  **As a result, Relator is left to guess as to why Encompass contends that these *specific claims* are entitled to dismissal**.  Based on this alone, Encompass failed to demonstrate that it is entitled to dismissal.  *See Grayson Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).  Given Defendant's approach, and the Court's duty, even with respect to *uncontested* motions "to review the motions to ensure that dismissal is proper", *Stevenson v.*

*City of Seat Pleasant*, 743 F.3d 411 416 n.3 (4th Cir 2014), the Court should find that all of its arguments are waived. *Id*.

But even if the Court and Relator could decipher and consider Encompass' arguments, it should reject its primary and desperate contention—that Relator's allegations lack plausibility. (Doc. 33 at 10) (internal citations omitted).  The fraudulent scheme alleged in this case is not particularly complex. Relator specifically alleged that Encompass schemed to bill the Government by utilizing nonclinical sales representatives to conduct preadmission screenings in violation of a litany of Medicare regulations that caused fraudulent admissions in order to generate profits.   (Doc. 25 ¶8-31).   Encompass' feigned confusion and misconstruction of the Amended Complaint should be viewed skeptically by this Court.

Moreover, Relator plainly pointed out that Medicare requires, among other things, that the clinical prescreens must be conducted by licensed clinicians prior to admissions into Encompass' facilities although a rehabilitation physician later reviews and documents his or her concurrence with the findings of the screening prior to the IRF admission. *Id*.[2]  In fact, Medicare's regulations dictate that at the time of admission, the patient's medical record at the IRF must contain documentation that demonstrates a comprehensive preadmission screening that meets all of the following requirements--:

(A)    **It is conducted by a licensed or certified clinician**(s) designated by a rehabilitation physician within the 48 hours immediately preceding the IRF admission….

(B)    It includes a detailed an comprehensive review of each patient's condition and medical history, including the patient's level of function prior to the event or condition that led to the patient's need for intensive rehabilitation therapy, expected level of improvement, and the expected length of time necessary to achieve that level of improvement;….

---

[2] At this stage Plaintiff's allegations are to be taken as true, although the Court can take judicial notice of Medicare's website.

(C)     It serves as the basis for the initial determination of whether or not the patient meets the requirements for an IRF admission to be considered reasonable and necessary in paragraph (a)(3) of this section.

(D)     It is used to inform a rehabilitation physician who reviews and documents his or her concurrence with the findings and results of the preadmission screening prior to the IRF admission.

https://www.govinfo.gov/content/pkg/CFR-2021-title42-vol2/pdf/CFR-2021-title42-vol2-sec412-622.pdf; 42 CFR 412.622

In the face of this, Encompass offered a variety of strange and confusing defenses, in addition to rejecting Medicare's regulations and the case law that require Relator's allegations to be accepted as true. It argued that the aforementioned requirements could be ignored or casually set aside as long as a rehabilitation physician adopted the unlawful prescreens prior to admission (Doc. 33 at 17).  Encompass also appeared to argue that the requirements could be ignored provided services were later found to be medically necessary after the fraudulent admission (Doc. 33 at 18).  Encompass further added, "[Relator] flatly concedes Encompass 'was causing fraudulent admissions/government reimbursements' for three patients because 'sales representatives' authorized 'narrative[s] that somehow rendered the admissions 'inappropriate.' (Doc. 33 at 9).  "CMS, however, recognizes that logical necessities require the involvement of nonclinical personnel in facilitating IRF admission processes, so the agency's guidance explicitly permits the conduct Relator casts as improper."  *Id*. Taken together, Encompass concluded Relator's claims are not plausible.

Setting aside the fact that Plaintiff's allegations should be taken as true in this stage of litigation, it is patently obvious to the Court that these arguments are utterly preposterous and meritless.  They warrant dismissal without further consideration.   Not only do they conveniently ignore the plain language of Medicare's own requirements, but they also call for

an absurd result.  Following Encompass's self-serving position to its logical end, a nonclinical sales representative could waltz into a permitting physician's office and take a medical history or even write an order for prescriptions later adopted by a licensed pharmacist prior to being paid for by Medicare.  So long as the patient's script was deemed medically necessary under this scenario, then there would be no material violation of Medicare's conditions for payment.

Despite Encompass' argument to the contrary, Medicare clearly distinguishes between a claim to it from the physician who adopted the readings of the nurse, for example, as compared to one who adopted the readings of any nonclinical passerby, patient himself, or self-interested and nonclinical sales representative. In fact, courts have held less egregious regulatory violations alone can constitute false claims.  In *United States v. Care Alternatives*, 81 F.4th 361 (3d Cir. 2023), the court allowed a Relator's FCA claims to proceed and reiterated that Medicare's documentation requirements are not "minor or insubstantial violations" even in cases where a Relator does not proceed under the theory that the physician's certifications of [terminal] illness were medically unreasonable. *Id*. at 362. Defendant's self-serving reading of this case would flatly ignore this precedent.   To be sure, any and all claims, submitted through the process outlined by Relator are "false" for purposes of the FCA.  Defendant's willingness to present this Court with such a spurious defense on these facts should further cast doubt on the credibility of its remaining arguments.

Assuming *arguendo*, Encompass could simply ignore Medicare's clear requirement that a licensed clinician must conduct the prescreen, the claims referenced in Relator's Amended Complaint are still false.  Relator detailed how the nonclinical sales representative's misleading reports were clearly relied upon to generate acceptance into Defendant's facilities. *See* ((Doc. 25) (¶18) ("Encompass provided the sales representatives with directives on how

10

to tailor clinical language and make clinical judgments in order to generate patient admissions.")(¶19); (Novia Mearidy…instructed Relator…how to go through the patient's progress notes from their hospital stay or home care and input medical justifications that *ensured* acceptance…") (Relator was provided scripts and instructed to blindly conclude admission was necessary); (¶21) (detailing rehab physicians would "rubber stamp" the sales representatives' clinical narratives though it was impossible to have reviewed the information); (¶25)(on-site clinicians complained about the fraudulent admissions); and (¶27-31) (showing as a result of the fraudulent scheme, Medicare was billed).

In the face of these allegations, Encompass relied upon *United States ex rel. Integra Med Analytics, LLC v Baylor Scott & White Health,* 816 F.App'x 892 (5th Cir. 2020) (Doc. 33 at 22) to suggest that the utilization of scripts in billing alone does not necessarily equate to propagating a fraudulent scheme to bill. But that case belies Encompass' contention that Relator's allegations concerning the scripts provided by her supervisor, Mearidy, lack plausibility.  In *Integra*, the court noted that the Relator's focus on "tip sheets" in order to allegedly upcode billings submitted to the Government was consistent with the new DRG coding rules. *United States ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*, 816 F. App'x 892, 895 (5th Cir. 2020).   The Court also concluded the documents were "non-leading." In the case *sub judice*, not only were the clinical prescreens conducted by nonclinical sales representatives, but they were also intentionally misleading. (¶18-25). Moreover, Relator's allegations further added that the process involved the rehab physicians rubberstamping multiple admissions.  Again, Relator alleged the following:

> Here, Encompass' physicians would have to rely on the compromised input of the sales representatives who were motivated by heavy sales quota/pressures to provide the medical clinical justification to cause admissions and just as importantly, they were unqualified to do so. In addition, Encompass' rehab physicians often had no practical ability to even

11

evaluate the flawed justifications provided by the sales representatives because the modules would illustrate that the certifying physicians would be bombarded by several requests from sales representatives in very short times to certify the admissions such that Relator witnessed certifications being electronically entered within one minute of the requests. Therefore, it was often practically impossible to review the clinical justifications of the patients for admissions purposes in that time frame even if the narratives contradicted Medicare's requirements for admissions and even if the narratives had been generated by individuals with a clinical background.  Apparently, the CEO of the Pearland hospital, Michael Cabiro recognized that the aforementioned scheme could be uncovered by Medicare auditors/regulators. To circumvent this, he plainly reminded the sales representatives, including the Relator, and the certifying physicians, that the times upon which the physician's adopted the clinical narratives be spread out in order to fly under the radar of Medicare regulators.

 (AC at ¶23-24).  Therefore, Relator's allegations are plausible and clearly distinguishable from those found insufficient in *Integra.   Iqbal,* 556 U.S. at 679 (plausibility will not look the same in every case rather, it is a "context-specific task that requires the reviewing court to draw on its judicial experience and commonsense"); *Zoltek Corp. v. Structural Polymer Grp*., 582 F.3d 893, 896 n.4 (8th Cir. 2010) (courts review the plausibility of each plaintiff's claim as a whole, not the plausibility of each individual allegation).

### **Encompass' Rule 9B Defense Is Disingenuous and Should Be Rejected**

A close reading of the renewed motion to dismiss quickly reveals that Encompass has no genuine defense under Rule 9B, and that explains why it reflexively raised the issue in a rather skeletal fashion and either ignored or sloppily applied the facts to the case law.  In defiance of the pleaded facts, Encompass claims, "Relator does not specifically identify what fraudulent conduct occurred, who engaged in the fraud, when it took place, where within Encompass's organization it took place, or how it committed in a manner that could give rise to "false' claims.  (Doc. 33 at 20). This is untrue.  Relator was simply required to identify Encompass was engaged in the scheme to defraud in order to meet the "who" requirement.

Neither the FCA nor Rule 9(b) requires the identification of individuals within a defendant corporation.  *See e.g. MDG Int'l, v. Australian Gold, Inc.*, No. 1:07-cv-1096, 2008 WL 3982072, at *3 (S.D. Ind. Aug. 22, 2008) (citing *Blaz v. Michael Reese Hosp. Found.*, 191 F.R.D. 570, 574 (N.D. Ill. 1999) (finding the institutional identity of the caller is what matters, not the individual employee, so plaintiff sufficiently pled the "who" requirement of Rule 9(b))); *see also Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 783 n.12 (2000) ("there is no doubt that the term 'person' in § 3729 extends to corporations); 31 U.S.C. 3729; *see Cook County, III.  V. United States ex rel. Chandler*, 538 U.S. 119, 125 (2003); *United States ex rel. Lutz v. Berkley Heartlab, Inc*., Civ. Action No. 9:14-230 RMG (Dec. 4, 2017) (rejected arguments that a specific individual at the corporation has to be identified in order to allege the requisite scienter); and *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 783, n.12 (emphasis added).

Not stopping there, Relator further addressed the "who" element and highlighted her management, Mrs. Mearidy, herself, as well as the initials of the specific patients impacted. (¶15-31).

Encompass also failed to develop any coherent legal argument that supports why it contends the "what" requirement has not been met based on the relevant allegations in the AC.  Instead, Encompass falsely claimed, "the SAC does not describe why the patient was ineligible to receive IRF services, does not identify any fraudulent services rendered, does not identify any providers….(Doc. 33 at 25).[3]  In order to allege "what", "a plaintiff must show a

---

[3] Encompass even adds that somehow the scripts provided to nonclinical sales representatives to generate guaranteed acceptance into its facility was of no consequence either because "[Relator] fails to explain how providing scripts or other guidance to nonclinical information collectors would be impermissible."  (Doc. 33 at 22).

link between allegedly wrongful conduct and a claim for payment actually submitted to the government." See, e.g., *United States ex rel. Clausen v. Laboratory Corp. of America, Inc*., 290 F.3 1301, 1311 (11th Cir. 2002); *U.S. ex rel. Dugan v. ADT Security Services, Inc*., No. DKC-03-3485, 2009 WL 3232080, at *14 (D. Md. Sept. 29, 2009).

Relator alleged, among other things, that she and other nonclinical sales representatives routinely provided "prescreens." (¶9-31). Relator further explained what statements were necessary in order to bill Medicare and that Encompass falsely certified compliance to bill the same. *Id*. Relator also alleged that she and others were directed to issue prescreens that were intentionally misleading. *Id*. Beyond ignoring compliance requirements that concerned licensed clinicians conducting the prescreens, Relator alleged that the admission process at Encompass further entailed the rehabilitation physicians "rubber stamping"/certifying misleading prescreens that included false statements that the patient "required treatment" prior to admissions as part of the claim submission process.[4] *Id*. Indeed, the medical scripts were provided to "guarantee acceptance" and she and others were instructed to input the patients "required three disciplines." Id at ¶27. Relator explained that she followed the directives of the company. As a result of this process, and following these directives, Relator alleged "how" she and others caused false claim submissions to Medicare for patients that should have never been admitted. (AC ¶9-31). One pertinent part of the compliant alleged the following:

> ….Undeterred by Relator's and others expressed concerns, Mearidy demanded that her sales representatives, including Relator, continue to meet sales quota and skirt Medicare guidelines for reimbursement by **also omitting any language in their clinical narrative that made admissions to their hospitals inappropriate**. In fact, on or about November 2022, **at the behest of Mearidy**, a patient named M. Harris with a date of birth of 1/8/1941,

---

[4] This is plausible given the directives of the CEO and internal complaints.

was admitted for skilled nursing services for 12 days. However, M. Harris (Patient #58062) was a "psych" patient who had expressed she was unable to participate in daily therapy prior to admission. Still, Medicare was billed approximately $20,000 **based on (Relator's) prescreen/clinical narrative** and the certification by Dr. Natasha Rose (Medical Director). The **medical notes charts for this patient prior to admission clearly demonstrated that the patient refused therapy** although the Medicare guidelines for this patient required that she be able to complete a minimum of fifteen hours of therapy per week. After admitting this patient with no medical necessity and no ability to benefit from treatment into the Pearland facility, Encompass refused to discharge prior to billing Medicare in the aforementioned amount her even after the **medical chart indicated that this patient would not leave her room nor participate in any treatment modality immediately following the admission.**

Therefore, Relator alleged the patient admissions were based on causing false certifications with the requisite Medicare guidelines and admitting patients who lacked medical necessity even when the medical charts indicated said patients should have been deemed ineligible to receive services from Encompass based on the IRF criteria. (AC ¶13). Moreover, Relator provided examples that pursuant to following the fraudulent scheme mandated by her supervisor, certain patients were admitted, and Medicare was billed as a result. (AC ¶9-31).

Encompass intentionally left Relator to speculate on why it claims the "when" requirement is missing. Although it failed to muster any legal support whatsoever as to why it contends Relator failed to meet the "when" requirement, the facts and the case law demonstrate otherwise. Relator worked for Encompass for a very limited time period, so there is no question as to when the subject events occurred. Defendant should not be able to dismiss a claim for lack of fair notice on the basis it does not know when the violations occurred when it has access to its own records showing the limited dates in which the Relator was employed. More importantly, Relator provided the approximate dates of her hire, when the fraudulent directives were given and when the fraudulent admission that were paid for by the

Government occurred. (AC ¶25-31).  *See, e.g.*, *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (allegation that misrepresentation occurred "sometime in late August or early September 2003" satisfied Rule 9(b); *Comentis, Inc v. Purdue Research Found.*, 765 F.Supp.2d 1092, 1110 (N.D. Ind. 2011) ("in or about February 2009" provided sufficient detail under Rule 9(b)); *Greer v. Advanced Equities, Inc.*, 683 F.Supp.2d 761, 772 (N.D. Ill. 2010)("the 'fall of 1999' or 'November 1999'…is specific enough under Rule 9(b)"). Ultimately, the Court should ignore Encompass's perfunctory approach to this issue.

Although Encompass offers this Court feigned outrage regarding the claims against it, it understands how difficult it is to show why it is entitled to dismissal as a matter of law at this stage, based on Rule 9B in light of these allegations and the relevant case law. Time and time again, courts have rejected attempts of defendants to force Relators to overcome overly detailed criteria to survive a Rule 9(b) challenge.  In *Mazik v. Kaiser Permanente, Inc.*, No. 19-CV-00559-DAD-KJN, 2024 WL 584162 (E.D. Cal. Feb. 13, 2024), the district court rejected "a laundry list of details that they argue Relator has failed to alleged" before concluding that a relator who indicated the who (defendants), the "what" (tampering with auditing software), the "when" ("since at least 2008)"); the "why" (to decrease the chance of identifying claims errors in claims"); and the "how" the alleged scheme is fraudulent (by claiming that the claims were accurate and complete despite knowing this was untrue) was sufficient to state a claim.  *Id*. at *8. Relator has exceeded that standard.

Encompass attempted to rely upon *Grubbs*, but the Fifth Circuit rejected arguments that "because presentment is the conduct that gives rise to § 3729(a)(1) liability, Rule 9(b) demands that is the contents of the presented bill itself that must be pled with particular detail and not inferred from the circumstances."  The Court stated:

> We must disagree with the sweep of the assertion.  Stating "with particularity the circumstances constituting fraud" does not necessarily and always mean stating the contents of a bill.  The particular circumstances constituting the fraudulent presentment are often harbored in the scheme.  A hand in the cookie bar does not itself amount to fraud separate from the fib that the treat has been earned when in fact the chores remain undone.  Standing alone, raw bills-even with numbers, dates, and amounts—are not fraud without an underlying scheme to submit the bills for unperformed or unnecessary work.  It is the scheme in which particular circumstances constituting fraud may be found that make it highly likely the fraud was consummated through the presentment of false bills.

*United States rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009).  Instead, it held that fraudulent presentment requires proof of the claim's falsity, **not its exact contents**.  To that end, a Relator simply needs to show the existence of a billing scheme and offer particular and reliable indicia that false bills were actually submitted as a result of the scheme such that a reasonable jury could infer that more likely than not the defendant presented a false bill to the government.  *Id*. at 189-190.  That court explained that to require more at the pleading is one step shy of requiring actual documentation with the complaint as well as a level of proof not demanded to win at trial.

*Id*.  Applying that logic, in *McClinton on behalf of United States v. Southerncare, Inc*., No. 3:16-CV-128-CWR-FKB, 2021 WL 2587162, at *2 (S.D. Miss. June 23, 2021), the court found a simple allegation that "multiple visits to J.W. during which Nurse Jenkins would visit no more than ten minutes, would not fully inspect the patient and would provide no wound care, but would document an extensive visit and would bill Medicare accordingly" was sufficient to state a FCA "presentment" claim.  It is abundantly clear that based on the law in this Circuit and the factual allegations, Relator's allegations are clearly sufficient to satisfy Rule 9(b).

## Relator Clearly Met the Materiality Standard

Finally, the Court should reject Encompass's argument that its actions were immaterial for the purposes of the FCA. Defendant's position concerning materiality, reduced to its essence, is that it would have been of no concern to CMS, and CMS would have fully paid

17

Defendant's claims, even if Defendant had disclosed that the admissions for which they sought and received reimbursement had been performed in violation of numerous regulations expressly intended to protect patient safety and the integrity of its very existence.   For example, Encompass attempted to brush aside the significance of these allegations by pointing to the fact that Medicare contemplates an assessment period following admission that allows for reimbursable services even if a patient is unable to complete the expected IRF stay. (Doc. 33 at 20).   Such a position is completely and facially untenable. *E.g., United States ex rel. Walker v. Loving Care Agency, Inc.*, 226 F. Supp. 3d 357, 367 (D. N.J. 2016) (where Relator alleged a scheme to circumvent the defendant's obligations by misrepresenting regulatory compliance, the court denied the defendant's motion to dismiss, stating that "it finds it hard to fathom that the Government would find such blatant disregard of its regulations, if true, to be immaterial of its decision to pay Defendant"). Without saying so, Defendant essentially is urging the Court to rule that it is implausible that CMS would have withheld payment if it had been apprised of Defendant's extensive violations of regulations at the time of claim submissions.

Defendant is clearly wrong.  The materiality standard "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *See Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 579 US 176, 182, 193(2016).   *Escobar* emphasized that a matter may be material if a reasonable person would attach importance to it in determining a choice of action, regardless of the defendant's subjective beliefs about the matter. *Escobar*, 579 U.S. at 192.  Post-*Escobar,* the Fifth Circuit made clear that a Relator only needs to show "proof… that the defendant's false statements **could have influenced** the government's pay decision or had the potential to influence the government's decision, not

that the false statements actually did so." *See United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 661 (5th Cir. 2017).

Here, Relator clearly alleged that **nonclinical sales representatives** were relied upon rather than clinicians. These individuals also provided *misleading clinical narratives* and then had the rehabilitation physicians/adopt the same. Relator specifically alleged that her supervisor emphasized that the clinical narratives were relied upon by the physicians for admission purposes so that it could generate profits (reduce the number of empty beds). (Doc. 28 at ¶21.). Driving the point further, Relator detailed how the unique process employed by Encompass, which was far different from any of her prior experiences, led to the fraudulent admissions and subsequent billing to the Government. (Doc. 28 at ¶15-31). Relator also pointed out that the onsite clinicians at the Pearland hospital complained about the patients who were admitted but lacked medical justification based on the clinical narratives of sales representatives. (Doc. 28 at ¶25).

Relator has properly pled facts that, when proven at trial, will establish that Defendant's undisclosed regulatory violations were material. *See Escobar*, 579 U.S. at 182 (quoting the FCA's definition of "material" at 31 U.S.C. § 3729(b)(4), i.e., "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money"); *id*. at 193 ("materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation'"), quoting 26 R. Lord, Williston on Contracts § 69:12, at. 549 (4th ed. 2003). Based on the case law, and facts presented, the court should reject any suggestion that the allegations fail to demonstrate sufficient materiality.[5]

---

[5] Encompass conceded the scienter prong, although Relator alleged the uniqueness of Defendant's admissions process versus industry standards (¶17); an attempt to coverup the fraudulent scheme by the CEO (Doc. 28 ¶24); Defendant's refusal to reduce the scheme to writing (¶18); a commitment to pursue the fraudulent scheme

Again, in *United States v. Care Alternatives*, 81 F.4th 361, 368 (3d Cir. 2023), the Court allowed a Relator's FCA claims to proceed beyond summary judgment and held that Medicare's documentation requirements are not "minor or insubstantial violations." Ultimately, the court credited summary judgment evidence that defendants' documentation deficiencies were pervasive; defendants were aware of the gravity of their noncompliance; and the patients were also potentially ineligible, as a medical matter. *Id*. at 362.   Importantly, the court found that even in cases where a Relator does not proceed under the theory that the physician's certifications of [terminal] illness were medically unreasonable, the defendants' documentary violations in the abstract were sufficient to find materiality. *Id*.

In the case *sub judice*, the Relator showed material noncompliance with respect to its nonclinical sales representatives performing clinical duties in direct contravention of Medicare requirements; false certifications as to the same; and a mandate from management to continue this scheme despite the fact that patients were being admitted without medical justification. (Doc. 28 at ¶15-31). Relator also provided examples showing the Government was billed for medically unnecessary treatment.[6]  *Id*. And to be sure, "claims for medically

---

despite internal complaints from clinicians (¶25); and their own auditors attempt to circumvent the false admissions based on renewed commitment for sales representatives to find magic language to warrant admissions.  (¶26).  "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Consol. Edison Co. of N.Y., Inc*., v. FERC, 510 F.3d 333, 340 (D.C. Cir. 2007).

[6] The irony embedded in Encompass's argument is stark.  On the one hand, Encompass finds nonclinical sales personnel qualified to perform the critical function of reviewing, *inter alia*, the medical history, including the patient's level of function prior to the event or condition that led to the patient's need for intensive rehabilitation therapy, expected level of improvement, and the expected length of time necessary to achieve that level of improvement (which is then relied upon by the rehabilitation physician). (Doc. 33 at 14-15).  On the other, said individual is unqualified to explain why in this case, certain patients failed to qualify for admissions based on Medicare's unambiguous exclusion criteria.  The Court should reject Defendant's credibility attacks against Relator and erroneous conclusions that she failed to allege why the admissions were "medically inappropriate". Defendant also ignored Relator's allegations that the Encompass's admissions process **relied** on the input of the nonclinical sales representatives and factual content that supported the same.

unnecessary treatment are actionable under the FCA." *U.S. ex rel. Riley v. St Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).  Relator met the materiality standard.

## V.   CONCLUSION

According to Encompass, "the precursor question posed by this Motion, as mandated under Rule 8(a), is simply: Are the well-pleaded facts consistent with benign, non-fraudulent conduct?" (Doc. 33 at 11).  The answer is a resounding no.  Neither Encompass' undeterred utilization of self-interested and nonclinical sales representatives to perform critical clinical decision-making on behalf of Medicare patients, the utilization of misleading scripts to generate admissions, the blind rubber stamping of admissions, nor the purposeful admission and billing of Medicare patients who lacked medical necessity is consistent with benign conduct.  Based on the foregoing facts and arguments presented, the Court should DENY Encompass' Motion to Dismiss in its entirety.

In the event that the Court concludes differently, Relator requests the opportunity to amend her complaint.  It is not remotely clear as to what is deficient at this stage.  *See Obra Pia Ltd. v. Seagrape Inv'rs LLC,* 19-cv-7840 (RA), 20121 WL 1978545, at *3 (S.D.N.Y. May 18, 2021) (Ordinarily, a plaintiff should be granted leave to amend at least once after having the benefit of a court's reasoning in dismissing the complaint).  *Lorely Fin. Jersey No. 3 Ltd. V. Wells Fargo Sec.*, *LLC* 797 F.3d 160, 190 (2d Cir, 2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of an amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies.").  Relator recognizes that this Circuit provides the Court with discretion as to whether she should be allowed an opportunity to amend, assuming it is necessary (without the filing of a proposed amended complaint); but Relator requests the Court exercise its discretion to allow it if necessary based on the procedural posture, arguments, and facts presented.

21

Dated:  May 15, 2024

Respectfully Submitted,

/s/ Volney Brand
Volney Brand (attorney in charge)
Brand Law PLLC
Bar # 24073253
3626 N Hall Ste 610
Dallas, Tx 75219
Telephone: 214-932-1472
Fax: 214-932-1473

/s/ Keith B. French, Jr.
Keith B. French, Jr. (of counsel)
Bar # 24115073
Keith B. French Law, PLLC
2734 Sunrise Blvd., Suite 304
Pearland, TX 77584
Kfrench@peoplefirstfirm.com
Telephone:832-243-6153 Fax:832-243-1927

**CERTIFICATE OF WORD COUNT**

I certify that the foregoing document complies with the word count limits contained in LR exclusive of the caption, signature block, and certificates as indicated by the word processing software utilized by Brand Law PLLC.

/s/ Volney Brand
Volney Brand
Brand Law PLLC
3626 N Hall Ste 610
Dallas, Tx 75219
Telephone: 214-932-1472
Fax: 214-932-1473

22

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing motion was electronically filed with the Clerk of Court using the CM/ECF system which will send notice of such filing to the registered CM/ECF users:

May 15, 2024

/s/ Volney Brand
 Volney Brand
Brand Law PLLC